**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HEALTHY GULF,
1010 Common Street, Ste 902,
New Orleans, LA 70112,

     *Plaintiff,*

    v.          Civil Action No. _____

DAVID BERNHARDT, in his official capacity
 as Secretary of the Interior,
1849 C Street, NW
Washington, DC 20240;

UNITED STATES DEPARTMENT OF THE
 INTERIOR,
1849 C Street, NW
Washington, DC 20240;

SCOTT ANGELLE, in his official capacity
 as Director of the Bureau of Safety and
 Environmental Enforcement; and
1849 C Street, NW
Washington, DC 20240; and

BUREAU OF SAFETY AND
 ENVIRONMENTAL ENFORCEMENT,
1849 C Street, NW
Washington, DC 20240,

     *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      In this action, Plaintiff Healthy Gulf challenges an unlawful rule allowing the Department of the Interior to waive crucial safeguards against catastrophic oil spills in the Gulf of Mexico.

2.      In 2010, an uncontrolled eruption of oil and drilling fluids—a "blowout"—caused an explosion on the deep-water drilling platform *Deepwater Horizon*.  The explosion killed eleven people and sank the platform.

3.      The subsequent oil spill crippled the Gulf of Mexico.  The spill dumped billions of gallons of oil into the Gulf, killed hundreds of millions of wild animals, ruined thousands of square miles of marine and estuarine habitat, afflicted thousands of Gulf residents with chronic health problems, and cost the region's fishing and tourism industries tens of billions of dollars in lost revenue and jobs.

4.      *Deepwater Horizon* was preventable.  Among the many mistakes leading to the explosion, the final was the failure of the platform's "blowout preventer," a device that should have automatically sealed the runaway well in the event of an emergency.  But the Department of the Interior and the offshore drilling industry had ignored evidence that blowout preventers worked only occasionally, if at all, and were susceptible to malfunction during extreme events like the *Deepwater Horizon* disaster, *i.e.*, precisely when the preventers are needed most.  This culture of negligence led directly to the failure of the *Deepwater Horizon's* blowout preventer and the resulting explosion.

5.      To remedy this problem and prevent another *Deepwater Horizon*, the Department of the Interior solicited recommendations from panels of experts who had comprehensively

reviewed the *Deepwater Horizon* disaster.  The Department then used those recommendations to develop the Well Control Rule, which implemented dozens of requirements for improving the safety of offshore drilling operations.  Many of these recommendations adopted necessary rules for the design, installation, and testing of the blowout preventers that, if used properly, would have stopped *Deepwater Horizon*.  Following a notice of the proposed rule and a public comment period, the Well Control Rule was finalized in April 2016.

6.      But these requirements were a nuisance to the offshore drilling industry, which the expert panels had sharply criticized for a culture that disregarded environmental and safety concerns prior to *Deepwater Horizon*.  The industry consistently opposed large swaths of the Well Control Rule, and, in 2017, successfully petitioned the Trump Administration to undo significant parts of the Rule.

7.      That was not all.  To advance what it calls its "Energy Dominance" agenda, the Trump Administration has implemented an unpublished rule to systematically weaken certain portions of the Well Control Rule that remain.  The Department of the Interior has used the Well Control Rule's provisions for case-by-case, *ad hoc* exceptions from its requirements in order to grant hundreds (and likely thousands) of waivers to offshore operators seeking to avoid the Rule's blowout preventer requirements, particularly those requirements relating to the testing of blowout preventers, which are designed to ensure that blowout preventer systems will work properly in the event of an emergency.

8.      The consistent, concentrated nature of these waivers is the unmistakable product of agency rulemaking *sub silentio*, without which Defendants could not so readily issue waivers for the Well Control Rule.  Indeed, Defendants have occasionally alluded to the existence of this hidden policy (the "Waiver Rule").  But like the individual waivers themselves, the Waiver Rule

has never been published for notice and comment as required by the Administrative Procedure Act ("APA").  Nor has the Waiver Rule undergone environmental analysis under the National Environmental Policy Act ("NEPA").

9.      Thus promulgated without public input, the Waiver Rule directly threatens the interests of Plaintiff's members, who depend on a healthy Gulf ecosystem for their recreational, economic, and aesthetic interests.  The Gulf is renowned for its wildlife, including species of sea and shore birds, marine mammals, sea turtles, and fish.  Like millions of people throughout the Gulf, Plaintiff's lives are closely intertwined with the fate of these species, which are acutely sensitive to large oil spills.

10.      By returning the regulation of blowout preventers to the pre-*Deepwater Horizon* status quo, Defendants have substantially increased the chances of a catastrophic oil spill in United States coastal waters and, in turn, the chances of irreparable damage to the natural resources upon which Plaintiff's members rely.

11.      As the D.C. Circuit and numerous courts in this District have recognized, review of agency action is available under the APA even where, as here, a federal agency has not reduced all of an agency action to a public document.  Were this otherwise, agencies could consistently avoid judicial review of their actions simply by declining to formalize them in writing.  The Court should apply that doctrine here, declare that the Rule was promulgated absent the procedures required by the APA and NEPA, and vacate the Rule.

## PLAINTIFF

12.      Plaintiff HEALTHY GULF ("Healthy Gulf") is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico.  Healthy Gulf has been

actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end

new oil and gas leasing.  Healthy Gulf has offices in New Orleans, Louisiana; Pensacola,

Florida; and Madison, Mississippi.  Healthy Gulf's 655 members are located throughout the

United States, and regularly use the ocean waters and coastal areas throughout the Gulf of

Mexico, as well as along the Atlantic and Pacific coasts.

13.     Healthy Gulf brings this action on its own behalf.  An important component of

Plaintiff's mission is educating and informing its members about the ways in which their

interests are affected by federal policy in the Gulf.  Thus, Plaintiff routinely educates its

membership—through newsletters, action alerts, blogs, and social media posts—concerning

proposed rulemaking, legislation, and other policy developments.

14.     Plaintiff's capacity to provide updates to its membership is compromised when

the government does not comply with statutes requiring dissemination of information.  Absent

the disclosures required by the APA, Plaintiff is unable to adequately inform its members about

the Defendants' policymaking, such that Plaintiff and its membership cannot meaningfully

participate in that policymaking and subsequent agency action.

15.     Plaintiff also brings this action on behalf of its members.  Plaintiff's members

regularly use and enjoy the coastal environments adjacent to offshore drilling, by, for example

hiking, fishing, birdwatching, and engaging in aquatic recreation.  Plaintiff's members also own,

operate, and are employed by small businesses dependent on a healthy Gulf ecosystem, such as

fishing boats and tourist operators.   Two examples of such members are Louis Skrmetta, who

operates ferry company Ship Island Excursions in Gulfport, Mississippi, and Dana Honn, owner

of two seafood restaurants in New Orleans, Louisiana.

16.     A catastrophic oil spill in the Gulf would drastically and irreparably injure these interests.  As set forth below, the *Deepwater Horizon* disaster ravaged the Gulf's ecosystems and crippled the region's tourism and fishing industries.  Another such spill—even if only a fraction of *Deepwater Horizon*—would impede coastal recreation, kill the wildlife on which Plaintiff's members depend, and further injure coastal businesses still recovering from the *Deepwater Horizon* disaster.

17.     The Waiver Rule has injured these interests by allowing for the systematic evasion of some of the Well Control Rule's most crucial safeguards against blowouts.  As batteries of experts and Defendants themselves have concluded, noncompliance with the Well Control Rule increases the likelihood of offshore drilling accidents, which in turn increases the likelihood of oil spills that would harm or destroy coastal ecosystems and resources.  These risks constitute a concrete, particularized, and imminent injury to the interests of Plaintiff's members in coastal environments.

18.     The likelihood of offshore accidents is particularly high given the prevalence of offshore drilling in the Gulf of Mexico, which is still recovering from the effects of the *Deepwater Horizon* disaster.  There are roughly 2,000 drilling platforms in the Gulf, which in 2018 accounted for 643 million barrels of oil and 993 million MCF[1] of natural gas, roughly 99 percent of the national offshore totals for both minerals.  As of 2018, all but three of the 149 oil spills in the Outer Continental Shelf since 1972 had occurred in the Gulf.[2]

19.     Because Defendants have not divulged the Waiver Rule in its entirety, Defendants have made it impossible to quantify the exact increase in risk to Plaintiff's members caused by

---

[1] One MCF is equal to 1,000 cubic feet.
[2] Bureau of Ocean Energy Mgmt., *US Outer Continental Shelf Oil Spill Statistics* 23-28 (Mar. 2018), https://www.boem.gov/BOEM-2018-006/.

the Rule, but experience, common sense, and Defendants' own data leave no doubt that the

increase in risk to Plaintiff is, objectively and as a whole, substantial and non-trivial.

20.     These injuries will be redressed by a favorable decision of this Court, which

would subject the Waiver Rule to notice-and-comment rulemaking and associated environmental

analysis.  Those procedures, in turn, could lead Defendants to abandon or modify the Waiver

Rule, which would lessen the threats to Plaintiff's membership's interests.

## DEFENDANTS

21.     Defendant DAVID BERNHARDT is the Secretary of the Interior, and has

ultimate authority to implement the Outer Continental Shelf Lands Act ("OCSLA").  He is sued

in his official capacity.

22.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("DOI" or

"Department") is an agency within the executive branch of the federal government, tasked with

regulating offshore drilling through OCSLA and other statutes.

23.     Defendant SCOTT ANGELLE is the Director of the Bureau of Safety and

Environmental Enforcement, the official to whom the Secretary of Interior has delegated

implementation of OCSLA.  He is sued in his official capacity.

24.     Defendant Bureau of Safety and Environmental Enforcement ("BSEE") is an

agency within DOI.  In conjunction with the Bureau of Ocean Energy Management, BSEE is one

of two agencies with responsibility for implementing OCSLA.  BSEE applies the Waiver Rule.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, because this action arises under federal law, specifically OCSLA and the APA, 5 U.S.C.

§ 702.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

27.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## LEGAL BACKGROUND

### A.  The Outer Continental Shelf Lands Act

28.     The Outer Continental Shelf is the area of subsoil and seabed between state waters and the United States' Exclusive Economic Zone, *i.e.*, two hundred nautical miles from shore.[3]  The United States owns rights to undersea minerals (such as oil and gas) in the Outer Continental Shelf, and may lease rights to extract those minerals through offshore drilling.

29.     OCSLA regulates offshore drilling in the Outer Continental Shelf.  Congress passed OCSLA after recognizing, *inter alia*, that offshore drilling "should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts . . . or other occurrences which may cause damage to the environment or to property, or endanger life or health."  43 U.S.C. § 1332(6).

30.     Thus, OCSLA authorizes the Secretary to issue regulations pertaining to several components of offshore oil and gas development, 43 U.S.C. § 1334(a)(1)-(8), but subordinates those grants to the general proviso that "[t]he Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein."  43 U.S.C. § 1334(a).

---

[3] *See* 43 U.S.C. § 1331(a) (defining Outer Continental Shelf); 48 Fed. Reg. 10,605, 10,605 (Mar. 14, 1983) (establishing Economic Zone).

31.     Acting pursuant to the Secretary's delegated authority, BSEE has promulgated the regulations contemplated by OCSLA at 30 C.F.R. Part 250.  These regulations require lessees of federal minerals (or their designees) to seek and obtain a "Permit to Drill" before they "begin drilling any well or before [they] sidetrack, bypass, or deepen a well." 30 C.F.R. § 250.410.  The Permit application must include detailed information concerning the well's blowout preventer, *id.* §§ 250.410(a), 250.411(f), including "[a] complete description of the BOP system and system components," such as "[p]roposed BOP test pressures."  *Id.* § 250.731(a)(2).

32.     Notwithstanding these provisions, the regulations allow lessees and operators to obtain two types of waivers from BSEE's safety requirements, the first of which is known as "alternate compliance."  Specifically, lessees and operators may "use alternate procedures or equipment during operations," *id.* § 250.701, if the alternate procedure or equipment "provide[s] a level of safety and environmental protection that equals or surpasses current BSEE requirements," *id.* § 250.141(a).  To obtain an alternate compliance waiver, the applicant "must receive the [BSEE] District Manager's or Regional Supervisor's written approval," *id.* § 250.141(b), and "must either submit information or give an oral presentation to the appropriate Regional Supervisor . . . describ[ing] the site-specific application(s), performance characteristics, and safety features of the proposed procedure or equipment," *id.* § 250.141(c).

33.     The regulations also allow lessees and operators to apply for wholesale "departures" from their requirements.  *Id.* § 250.702.  The process for obtaining approval for such a waiver is *less* stringent than obtaining permission for alternate compliance: an applicant need only "apply for a departure by writing to the District Manager or Regional Supervisor."  *Id.* § 250.142.

**B.  The National Environmental Policy Act**

34.      Congress enacted NEPA—the "basic national charter for protection of the

environment," 40 C.F.R. § 1500.1(a)—to ensure that federal agencies consider the environmental

consequences of their actions.  42 U.S.C. § 4331(a)–(b).  "The NEPA process is intended to help

public officials make decisions that are based on [an] understanding of environmental

consequences, and take actions that protect, restore, and enhance the environment."  40 C.F.R. §

1500.1(c).

35.       The Council on Environmental Quality has promulgated regulations that

implement NEPA and that bind Defendants.  40 C.F.R. § 1500.3.

36.      NEPA's heart is its requirement that agencies prepare an "environmental impact

statement" ("EIS") for any "major Federal action[] significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(C).  An EIS must describe: (1) the "environmental

impact of the proposed action;" (2) any "adverse environmental effects which cannot be avoided

should the proposal be implemented;" (3) "alternatives to the proposed action;" (4) "the

relationship between local short-term uses of man's environment and the maintenance and

enhancement of long-term productivity;" and (5) "any irreversible and irretrievable commitments

of resources which would be involved in the proposed action should it be implemented."  *Id.*

37.      Under NEPA, "federal actions" include "new or revised agency rules, regulations,

plans, policies, or procedures."  40 C.F.R. § 1508.18(a).

38.      An agency may prepare an environmental assessment ("EA") to determine if its

action is "significant" and therefore requires an EIS.  40 C.F.R. § 1508.9(a)(1).  An

environmental assessment must "provide sufficient evidence and analysis for determining

whether to prepare an [EIS]" and discuss "the need for the proposal, [] alternatives . . . [, and] environmental impacts of the proposed action and alternatives[.]"  *Id.* § 1508.9(a), (b).

39.     If a lawful environmental assessment reveals that the proposed action will not have a significant impact on the environment, the preparing agency need not prepare an EIS.

### C.  The Administrative Procedure Act

40.     The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702.  Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

41.     Because neither OCSLA nor NEPA provide their own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the APA.  *See* 5 U.S.C. § 701(a).

42.     Under the APA, an agency must provide the public with notice of a proposed rule, 5 U.S.C. § 553(b), and give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

43.     Agencies cannot evade the APA's requirements merely by declining to publish a rule for comment.  "A contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing."  *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 139 (D.D.C. 2018) (quotation omitted).

## FACTUAL ALLEGATIONS

### A. Defendants Strengthen Blowout Preventer Requirements Following the Deepwater Horizon Catastrophe

44.     Oil and gas exploration in the Outer Continental Shelf relies on offshore drilling rigs, each of which may drill several wells.

45.     In deep reservoirs of oil and gas, the overlying rock exerts enormous pressure on mineral deposits.  A successful offshore well must calibrate its internal pressure to balance the pressures in the mineral deposits: if the well's pressure is too high, well fluids will flood out of the well and contaminate the minerals.  If the well pressure is too low, the minerals will rush into the well and up to the surface, erupting uncontrollably.  The latter scenario is commonly described as a "blowout."

46.     "Blowout preventers" are therefore crucial components of offshore drilling.  In general, blowout preventers generally stop a runaway well by severing the well or plugging the erupting oil.

47.      In April 2010, the rig *Deepwater Horizon* was finishing work on an exploratory well in the Macondo prospect, 42 miles off the Coast of Louisiana.  The well—which reached 5,000 feet to the ocean floor and then a further 13,000 feet beneath the earth's surface—failed from faulty design and operation, causing a "kick," *i.e.*, an unplanned rush of hydrocarbons into the well.

48.     When the blowout preventer failed to arrest this kick, oil subsequently erupted from the well, ignited, and exploded, sinking the *Deepwater Horizon* and killing eleven people.  By the time the well was capped in July 2010, the blowout had discharged 4.9 million *barrels* of oil into the Gulf of Mexico, contaminating over 43,000 square miles of ocean and over 1,300 miles of shoreline.

49.     The post-*Deepwater Horizon* cleanup effort was incredibly costly, enlisting 50,000 workers and prompting the release of one million gallons of dispersants to dilute the spill.

50.     The oil and drilling fluids released by the explosion, which contained enormous quantities of carcinogens and methane, ravaged wildlife.  Fish displayed lesions and sores or were born without eyes.  More than one million birds perished.  Dolphins and sea turtles stranded themselves at alarming rates.

51.     The blowout's effects on humans are not yet fully understood, but studies of cleanup workers and nearby residents have found abnormally high rates of chronic symptoms including rashes, bleeding from the ears and nose, headaches, coughing and other respiratory illnesses, anxiety, depression, and post-traumatic stress disorder.

52.     The blowout decimated the Gulf of Mexico's tourism and fishing industries.  One study has estimated that the blowout will cost the Gulf's fishing industry $8.7 billion and 22,000 jobs by 2020,[4] and a second estimated that the Gulf region would lose up to $22.7 billion dollars in tourism alone.[5]

53.     Since 2010, several reports have reviewed the *Deepwater Horizon* catastrophe and offered recommendations to prevent future blowouts.

54.     One recommendation was to divide the Departmental agency charged with regulating all components of offshore drilling—the Minerals Management Service—into multiple agencies.  As the reports noted, the Service's role as both environmental regulator and royalty collector often tempted the agency to sacrifice one function in favor of the other.

---

[4]  U. Rashid Sumaila et al., *Impact of the* Deepwater Horizon *Well Blowout on the Economics of US Gulf Fisheries*, 69 Can. J. of Fisheries and Aquatic Scis. 499, 505-06 (2012).

[5] Hugo Martín and Ronald D. White, *Spill May Cost Gulf Coast $22.7 Billion in Tourism, Study Estimates*, L.A. Times (July 23, 2010), https://www.latimes.com/archives/la-xpm-2010-jul-23-la-fi-oilspill-business-20100723-story.html.

55.     Acting on this recommendation, the Department divided the Minerals Management Service into the Office of Natural Resources Revenue (which collects revenue from mineral leases), the Bureau of Ocean Energy Management (which oversees large scale planning of offshore drilling), and BSEE, which enforces environmental and safety regulations at particular drilling sites.  *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011).

56.     Many of the reports also offered specific recommendations for blowout preventer design, testing, and operation.

57.     For example, the National Commission on the *Deepwater Horizon* noted that the rig's blowout preventer had only a single, inaccurate pressure gauge, and that the preventer had no way of indicating whether it had activated.[6]  The Commission therefore noted the importance of conducting pressure tests on blowout preventer systems, which ensure that the blowout preventers are fully functional.[7]  The Commission also cautioned that "protocols for testing of blowout preventers must be put in place and enforced."[8]

58.     The National Academy of Engineering likewise recommended dozens of improvements to blowout preventer monitoring, automation, and reliability, concluding that both Defendants and the drilling industry had previously failed to respond to the preventers' well-documented shortcomings.[9]

59.     Among the many specific, technical flaws these reports identified was the failure of *Deepwater Horizon's* "blind shear ram," a failsafe device used in blowout preventer systems

---

[6] Nat'l Comm'n on BP Deepwater Horizon Oil Spill and Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling* 274 (Jan. 2011) [hereinafter Commission Report].

[7] *Id.* at 73-74, 299.

[8] *Id.* at 299.

[9] Nat'l Acad. of Eng'g & Nat'l Res. Council, *Macondo Well Deepwater Horizon Blowout: Lessons for Improving Offshore Drilling Safety* 73-74 (2012) [hereinafter Engineer's Report].

to sever a runaway well's pipe and capable of activation from the surface, by a remote operated vehicle, or by an automated "deadman" system.[10]  The National Commission concluded that the blind shear ram possibly failed from poor maintenance.[11]

60.    The reports also noted the possibility that *Deepwater Horizon* resulted from a failure of the blowout preventer's "choke" and "kill" valves, which, during an emergency, funnel drilling mud down into the well at pressures high enough to plug the erupting oil.  According to some sources, there was a twenty percent likelihood that failure of these valves was responsible for the failure of the rig's "emergency disconnect system," which, in turn, would have activated the rig's blind shear ram.[12]

61.    Finally, the reports noted that *Deepwater Horizon* may have been prevented by adequate "annular" valves, which are donut-shaped valves lining the interior of a well's casing. The annular preventers are designed to inflate and "pinch" a well shut, but may not have properly functioned in the pressures present during the *Deepwater Horizon* blowout.[13]  A diagram of *Deepwater Horizon's* blowout preventer—including its annular valves, choke and kill valves, and blind shear ram—appears on the following page.[14]

---

[10] *See generally id.* at 46-49.
[11] Commission Report at 115.
[12] Engineer's Report at 56.
[13] Commission Report at 92, 274; Engineer's Report at 59-63.
[14] Engineer's Report at 47.



**Deepwater Horizon BOP Port Side**
(from DNV report of 20 March 2011, pg. 14)

62.     In 2015, BSEE initiated a rulemaking to implement many of these

recommendations.  80 Fed. Reg. 21,504 (Apr. 17, 2015).  As BSEE recognized, "[o]ne consistent

element in each of the [*Deepwater Horizon*] investigations was the recognition that additional

requirements related to [blowout preventers] and well-control equipment are needed" to avoid

another *Deepwater Horizon*-type catastrophe.  *Id.* at 21,508.  For example, the investigations

consistently recommended that BSEE "establish testing . . . requirements for [blowout

preventers] to ensure operability and increased reliability appropriate to the environment and

application."  *Id.*

63.     The proposed rule, which was published in the federal register on April 17, 2015,

focused on five categories of requirements related to blowout preventers: shearing requirements,

equipment reliability and performance, third-party verification of preventer systems, disclosure

of preventer failures or near failures, and blowout preventer testing.  The agency received public comments over a ninety-day comment period.

64.     One year later, BSEE finalized the Well Control Rule, which added or modified 66 provisions to OCSLA's implementing regulations.  81 Fed. Reg. 25,887 (Apr. 29, 2016). Among these changes were detailed requirements for subsea blowout preventers, 30 C.F.R. § 250.734, preventer components susceptible to high pressures and temperature, *id.* § 250.736, preventer testing, *id.* § 250.737, contingency operations, *id.* § 250.738, and preventer maintenance and inspection, *id.* § 250.739.

65.     With respect to blowout preventer testing, the Rule "add[ed] high-pressure test requirements for [blind shear ram]-type [preventers], outside of all choke and kill side-outlet valves (and annular gas-bleed valves for subsea [preventers]), and inside of all choke and kill side-outlet valves below the uppermost ram."  80 Fed. Reg. at 21,524-25 (describing new requirements codified at 30 C.F.R. § 737(b)(2)); *see also id.* at 21,525 (adding "new requirement" at 30 C.F.R. § 737(d)(7) "to pressure test annular type [preventers]"); *id.* (adding "new requirement" at 30 C.F.R. § 7373(d)(10) "to function test BSR [preventers] every 14 days").  The Well Control Rule thus added new testing requirements for various types of equipment, including those that may have contributed to the *Deepwater Horizon* disaster.  *Supra* ¶¶ 59-60 (discussing the failures of the choke and kill valves, as well as the blind shear ram).

66.     The Rule also made pre-existing test requirements more effective.  *See, e.g.*, *id.* (requiring pressure test results to be recorded on a four-hour chart to ensure that "the chart . . . display[s] enough line curvature length to detect a leak during the test").

67.     In the proposed Rule, BSEE explained "that the current testing protocols and verification procedures must be strengthened to ensure that the capabilities of shearing equipment are clearly understood and demonstrated."  *Id.* at 21,590.

68.     The Well Control Rule complied with NEPA: an accompanying Environmental Assessment concluded that the Rule would lower the risk of blowouts and associated environmental damages in three Outer Continental Shelf regions (the Pacific, Arctic, and Gulf of Mexico).

**B.  The Trump Administration Guts Enforcement of Blowout Regulations and Develops the Waiver Rule**

69.     On March 28, 2017, President Trump ordered federal agencies to "review all existing regulations, orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil, natural gas, coal, and nuclear energy resources."  Exec. Order No. 13783, 82 Fed. Reg. 16,903 (Mar. 31, 2017).

70.     Consistent with advocacy from the offshore drilling industries, the Trump Administration has vigorously dismantled safeguards designed to prevent another *Deepwater Horizon* disaster.

71.     On April 28, 2017, President Trump issued Executive Order 13795, which directed the Secretary of the Interior to revise the 2016 Well Control Rule.  Exec. Order No. 13795, 82 Fed. Reg. 20,815 (May 3, 2017).  In turn, then-Secretary of the Interior Ryan Zinke directed BSEE to revise the 2016 Well Control Rule to ensure that offshore drilling would be "promoted."  Sec'y of Interior, Secretarial Order No. 3350 at 2 (May 1, 2017).  This process has

been overseen by Director Angelle, who has close and lucrative ties to the petroleum industry[15] and who, in a brazen effort to evade the Freedom of Information Act and other public records laws, encouraged executives in the offshore drilling industry to communicate with him orally on his personal cellphone rather than produce written records subject to preservation and disclosure requirements.[16]

72.     The final rule, published on May 15, 2019, repeals or modifies dozens of requirements for blowout preventers.  84 Fed. Reg. 21,908 (May 15, 2019).

73.     But the Administration was not content to gut significant portions of the Well Control Rule through formal rulemaking.  It also sought to eviscerate the *intact* components of the Rule by executing a new and unpublished policy designed to defang some of the Rule's most important requirements.

74.     On September 22, 2017, Director Angelle wrote BSEE Gulf of Mexico Regional Director Lars Herbst to ask whether, in lieu of delaying the Well Control Rule's effective date, BSEE could effectively cripple the Rule by issuing scores of departures.  Angelle explained that "[w]hile we have discussed the possibility of promulgating a rule that further delays the implementation of the dates of the yet to be effective dates of several provisions of the [Well Control Rule] we are revisiting the entire [Rule], please advise the possibility of avoiding that by considering evaluation of departure request of the proposed April 2018 rule."  *See* Ex. A at 1.

---

[15] *See* Tyler Bridges, *Scott Angelle's Close Ties to Oil Helps His Campaign for Governor*, The Advocate (Oct. 21, 2015), https://www.theadvocate.com/baton_rouge/news/politics/elections/article_ff8d2e03-0553-59d8-bced-a63917536131.html.

[16] Scott Angelle, *LAGCOE 2017 Keynote Presentation* (Oct. 24, 2017), *available at* https://www.youtube.com/watch?v=0ga5-zZXYpo; https://slate.com/culture/2018/11/john-oliver-last-week-tonight-drain-the-swamp-scott-angelle.html.

75.     Herbst then wrote to Gulf of Mexico Region Supervisor Michael Saucier for advice.  Saucier expressed doubts as to Director Angelle's request, explaining that "[i]f we do that I would use the directors [sic] phrase: 'put it in writing.'  The director should put it in writing that we do that."  *Id.* at 4.

76.     Herbst conveyed these doubts and more to Angelle, writing on September 23, 2019, that:

> I do not believe the waiver direction is correct.  This puts all the burden/ exposure on the permitting engineer or whatever level grants the departure.  Moving the implementation dates by rule is what is really needed.  *The only way to grant departures in this case is a National level policy document that instructs Regions to grant the waiver and conditions for granting the waiver.*

*Id.* at 1 (emphasis added).

77.     Herbst concluded by reiterating his belief that, if Director Angelle wished to delay the Well Control Rule, BSEE should issue a rule to that effect.  *Id.*

78.     Director Angelle responded with a one-word e-mail: "Thanks."  *Id.*

79.     Defendants did not propose or finalize a public rule that would have delayed the Well Control Rule.

80.     Instead, Defendants embarked on the course of action BSEE employees had cautioned was *not* appropriate: issuing so many waivers that the Well Control Rule was effectively—if not openly—delayed.

81.     Reporting indicates that between August 1, 2016 (shortly after the Rule's effective date of July 28, 2016) and March 22, 2018, DOI granted over 600 exceptions to the Well Control Rule's standards for blowout preventers at 30 C.F.R. §§ 250.730-739.[17]

---

[17] Ben Lefebvre, *Interior Hands Out Nearly 1,700 Waivers to Offshore Drilling Safety Rules*, Politico (Feb. 25, 2019), https://www.politico.com/story/2019/02/25/offshore-drilling-trump-administration-interior-department-1190762.

82.     Initially, Defendants granted these waivers to ensure a smooth and safe transition to the Well Control Rule's new requirements.  Thus, on July 25, 2016, Defendants explained that "if existing equipment is in substantial conformance with new requirements, the granting of a departure for a *limited* period of time to bring the equipment into full compliance should be granted unless there are obvious safety concerns."[18]  BSEE therefore released "an initial list of provisions within the [new well control] regulations and incorporated standards for which a departure request should be granted[.]"[19]  The agency reached similar conclusions regarding applications for alternate compliance.[20]

83.     But, consistent with Director Angelle's intent to delay the Well Control Rule *sub silentio*, Defendants have since confirmed that they have granted waivers at an exceedingly high rate even after the "limited period of time" in which BSEE relaxed the Well Control Rule's standards to account for transition to a new regulatory regime.

84.     Responding to congressional inquiries, BSEE has confirmed that it granted 960 requests for alternate compliance between January 20, 2017 and March 22, 2018, *i.e.*, over one exception per day and nearly *ten* for every platform affected by the Well Control Rule.  BSEE has not publicly released figures regarding the recent rate of departures.

85.     On information and belief, most of these exceptions deal with the Well Control Rule's requirements for high pressure or high temperature testing of blowout preventer components at 30 C.F.R. § 737.

86.     As a matter of course, Defendants do not release information related to these waivers.  The extraordinary number and pace of waivers, however, indicates that Defendants'

---

[18] BSEE, Bureau Interim Directive 2 (July 25, 2016) (emphasis added).
[19] *Id.*
[20] *Id.*

implementation of the Well Control Rule's exceptions provision have been governed by an unpublished policy allowing Defendants to rapidly and systematically grant waivers and departures for the testing of blowout preventers, rather than undertaking careful, case-by-case analysis required by the Rule.

87.     On information and belief, the hundreds of waivers and departures granted by Defendants in recent years flow from one or more rules governing the grant of waivers for (or departures from) the Well Control Rule's regulations concerning the testing of blowout preventers.

88.     Indeed, BSEE acknowledged in the Well Control Rule that the agency generally sought to issue waivers consistently, and was in fact "developing internal procedures to improve consistency." 81 Fed. Reg. at 25,928.  These procedures were, in part, the genesis for the Waiver Rule.

89.     Knowledgeable observers have explained  that the offshore drilling industry is aware that the Waiver Rule exists: an industry attorney has explained that "[a]fter a few of the large actors started [receiving waivers and departures], other companies said 'Hey, maybe we should, too.'"[21]

90.     The Waiver Rule has never been published in the Federal Register, circulated for public comment, or analyzed under NEPA.

91.     The Waiver Rule goes to a key component of the Well Control Rule, specifically its strict requirements for blowout preventer testing.  In its investigative report, the National Commission specifically criticized BSEE's predecessor agency for "conced[ing]" to industry demands to "halve[] the mandated frequency of [pressure] tests" that ensure the reliability of

---

[21] Lefebvre, *supra* n. 17.

preventers—"the critical last line of defense in maintaining control over a well."[22]  The

Commission further explained that in the time leading up to the *Deepwater Horizon* disaster, "rig

operators, by not testing blowout preventers, were basing their representations that the tool

would work on information not necessarily consistent with the equipment in use."[23]  This

reduces the ability of operators to ensure that their most critical safety equipment is functioning

properly.

92.     Waiving blowout preventer testing requirements thus risks the "severe

shortcomings of federal regulation of offshore oil drilling" that created the conditions for

*Deepwater Horizon*.[24]

93.     In particular, the Waiver Rule directly increases the risk of a loss of well control

and a catastrophic oil spill in the Gulf of Mexico.

94.     Apart from hurricanes, equipment failure is by far the most common cause of

platform oil spills in the Outer Continental Shelf, accounting for 30 percent of those spills at a

rate of nearly one per year.[25]  The Regulatory Impact Analysis for the Well Control Rule further

noted that "in 2013 and 2014 there were 8 and 7 [loss of well control] incidents per year,

respectively—a rate on par with pre-*Deepwater Horizon* [incidents]."[26]

95.     Assuming that the Well Control Rule would govern operations on 90 rigs (almost

all of which are located in the Gulf of Mexico), and, conservatively, that the Well Control Rule

would result in a one percent reduction in spilled barrels of oil per year, BSEE estimated that the

---

[22] Commission Report at 73-74.
[23] *Id.* at 74 (quotation omitted).
[24] *Id.* at 55.
[25] Bureau of Ocean Energy Mgmt., *US Outer Continental Shelf Oil Spill Statistics* 23-28 (Mar. 2018), https://www.boem.gov/BOEM-2018-006/.
[26] BSEE, Regulatory Impact Analysis 7, 62-64 (Apr. 11, 2016).

Well Control Rule would result in approximately 712 fewer barrels of oil spilled per year, at a benefit of $2.6 million per year in avoided spill containment and ecological damage.[27]

96.     By systematically departing from the Well Control Rule's provisions for blowout preventer testing, the Waiver Rule eats into the Well Control Rule's benefits.  According to BSEE's analysis in the Well Control Rule's Regulatory Impact Analysis, if the Waiver Rule diminishes the Well Control Rule's effectiveness by only one tenth, the Waiver Rule will result in roughly 70 extra barrels of oil spilled per year, at a cost of roughly a quarter million dollars per year.

## CLAIMS FOR RELIEF

### Count One
### Procedurally Inadequate Rulemaking, 5 U.S.C. §§ 553, 706

97.     Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

98.     Defendants have consummated decisionmaking on policies governing the approvals of alternate compliance with, and departures from, the Well Control Rule's requirements codified at 30 C.F.R. § 737.

99.     Defendants have relied on this decisionmaking to grant hundreds of waivers for blowout preventer testing requirements.

100.     This consistent, concentrated application of the Well Control Rule's provisions for alternative compliance and/or departures reflects Defendants' development and execution of the Waiver Rule.

---

[27] *Id.* at 64.

101.    The Waiver Rule is a "rule" under the APA, but was promulgated without notice-and-comment or other procedures required by the APA.

102.    The Waiver Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of its statutory authority, 5 U.S.C. § 706(2)(A), and/or was promulgated without procedure required by law, *id.* § 706(2)(D).

## Count Two
### Arbitrary and Capricious Rulemaking, 5 U.S.C. § 706(2)

103.    Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

104.    In developing and issuing the Waiver Rule, Defendants failed to provide any explanation for the Rule or its deviations from the agency's prior determinations in the Well Control Rule.

105.    The Waiver Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## Count Three
### NEPA Violation, 5 U.S.C. § 706(2), 42 U.S.C. § 4332(2)(C)

106.    Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

107.    Under NEPA, federal agencies must prepare an Environmental Impact Statement or an Environmental Assessment to consider the environmental effects of major federal actions. This analysis must precede the agency action, so that agencies can make informed choices among different alternatives.

108.     Defendants promulgated the Waiver Rule, major Federal action significantly affecting the quality of the human environment, without observance of the procedures required by NEPA.

109.     The Waiver Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of its statutory authority, 5 U.S.C. § 706(2)(A), and/or was promulgated without procedure required by law, *id.* § 706(2)(D).

## Prayer for Relief

WHEREFORE, Plaintiff prays that this Court:

1.     declare that Defendants' promulgation of the Waiver Rule violates NEPA and the APA;

2.     vacate the Waiver Rule;

3.     enjoin Defendants from applying the Waiver Rule or any of its substantive determinations;

4.     award Plaintiff its costs, attorneys' fees, and other disbursements for this action; and

5.     grant any other relief this Court deems appropriate.

DATED this September 26, 2019.

Respectfully submitted,

*/s/* Travis Annatoyn

Travis Annatoyn (D.C. Bar No. 462679)
Kristen Miller (D.C. Bar No. 229627)
Javier Guzman (D.C. Bar No. 462679)
Democracy Forward Foundation
1333 H. St. NW
Washington, DC 20005
(202) 601-2483

tannatoyn@democracyforward.org
kmiller@democracyforward.org
jguzman@democracyforward.org

*Counsel for Plaintiff*