# IN THE UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HEALTHY GULF,

        *Plaintiff*,

    v.

                            Civil Action No. 19-2894 (EGS)

DAVID BERNHARDT, *et al.*,

        *Defendants*.

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Travis Annatoyn (DC Bar No. 462679)
Kristen Miller (DC Bar No. 229627)
Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005
(202) 601-2483
tannatoyn@democracyforward.org
kmiller@democrcayforward.org

*Counsel for Plaintiff*

February 3, 2020

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

BACKGROUND ..................................................................................................... 3

   I.   Legal Background ....................................................................................... 3

   II.  Factual Background .................................................................................... 4

      A.  The *Deepwater Horizon* Disaster................................................... 4

      B.  The 2016 Well Control Rule............................................................ 7

      C.  2019 Amendments to the Well Control Rule................................... 8

      D.  The Waiver Rule .............................................................................. 9

      E.  Procedural History ........................................................................ 11

STANDARD OF REVIEW ................................................................................... 11

ARGUMENT ......................................................................................................... 13

   I.   Plaintiff Has Stated A Claim for Relief Under the Administrative Procedure Act ........... 13

      A.  Defendants Cannot Evade Review Under the Administrative Procedure Act by Declining to Announce Final Agency Action................................. 13

      B.  Plaintiff Has Plausibly Alleged the Existence of An Unannounced Policy.................. 15

   II.  Nothing Prohibits the Court from Reviewing the Waiver Rule......................... 20

      A.  Defendants Do Not Show That The Waiver Rule Is Implausible.................. 20

      B.  Plaintiff's Claims Are Not A Programmatic Challenge.................................... 27

      C.  Plaintiff's Claims Are Not Moot......................................................... 30

CONCLUSION ...................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Akiachak Native Cmty. v. Dep't of Interior*,
    827 F.3d 100 (D.C. Cir. 2016) .................................................................30

*Almaqrami v. Pompeo*,
    933 F.3d 774 (D.C. Cir. 2019) .................................................................30

*Am. Nat'l Ins. Co. v. FDIC*,
    642 F.3d 1137 (D.C. Cir. 2011) ...............................................................12

*Amadei v. Nielsen*,
    348 F. Supp. 3d 145 (E.D.N.Y. 2018) ........................................... *passim*

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.C. Cir. 2018)............................................ *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................... *passim*

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ........................................................21, 26

*Bark v. United States Forest Service*,
    37 F. Supp. 3d 41 (D.D.C. 2014) .............................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................12, 25

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ................................................................21

*Capital Legal Found. v. Commodity Credit Corp.*,
    711 F.2d 253 (D.C. Cir. 1983) ................................................................29

*Carlson v. Postal Reg. Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019) ................................................................25

*Cost Saver Mgmt., LLC v. Napolitano*,
    2011 WL 13119439 (C.D. Cal. June 7, 2011) ........................................23

*Hedgeye Risk Mgmt., LLC v. Heldman*,
    271 F. Supp. 3d 181 (D.D.C. 2017) .........................................................22

*Hisp. Aff. Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ......................................................... *passim*

ii

*Hisp. Aff. Project v. Perez*,
141 F. Supp. 3d 60 (D.D.C. 2015) ........................................................................14

*Jefferson v. Harris*,
170 F. Supp. 3d 194 ((D.D.C. 2016) ......................................................................21

*Jones v. Kirchner*,
835 F.3d 74 (D.C. Cir. 2016) .................................................................................12

*Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation*,
291 F. Supp. 3d 21 (D.D.C. 2017) .........................................................................11

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 881 (1990) ....................................................................................27, 28, 29

*Neustar, Inc. v. FCC*,
857 F.3d 886 (D.C. Cir. 2017) ...............................................................................26

*Owens v. Republic of Sudan*,
531 F.3d 884 (D.C. Cir. 2008) ...............................................................................12

*Paulin v. George Wash. Univ. Sch. Of Med. & Health Scis.*,
878 F. Supp. 2d 241 (D.D.C. 2012) .......................................................................20

*People for the Ethical Treatment of Animals, Inc. v. Dep't of Agriculture*,
7 F. Supp. 3d 1 (D.D.C. 2013) ..........................................................................21, 22

*\*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 ((D.D.C. 2015) ...................................................................15, 17

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) ...........................................................................26, 27

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ................................................................................................26

*Soundboard Ass'n v. Fed. Trade Comm'n*,
888 F.3d 1261 (D.C. Cir. 2018) .............................................................................13

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) ...............................................................................13

*Venetian Casino Resort, L.L.C. v. EEOC*,
530 F.3d 929 (D.C. Cir. 2008) ...........................................................................14, 24

*Villegas v. United States*,
926 F. Supp. 2d 1185 (E.D. Wash. 2013) ..............................................................21

*Zaidan v. Trump*,
    317 F. Supp. 3d 8 (D.D.C. 2018) ..................................................................20

**Statutes**

5 U.S.C.

    § 551 ..........................................................................................................27

    § 553 ..........................................................................................................13

    § 704 ....................................................................................................13, 28

43 U.S.C.

    § 1332 ..........................................................................................................3

    § 1334 ..........................................................................................................3

**Other Authorities**

30 C.F.R.

    § 250.141 ...........................................................................................4, 22, 29

    § 250.142 ......................................................................................................4

    § 250.198 ....................................................................................................23

    § 250.410 ......................................................................................................3

    § 250.701 ......................................................................................................3

    § 250.702 ......................................................................................................4

    § 250.731 ......................................................................................................3

    § 250.734 ..............................................................................................8, 10, 16

    § 250.736 ................................................................................................8, 16

    § 250.737 ............................................................................................... *passim*

    § 250.738 ................................................................................................8, 16

    § 250.739 ................................................................................................9, 16

76 Fed. Reg. 64,432 (Oct. 18, 2011) ..................................................................6

80 Fed. Reg. 21,504 (Apr. 17, 2015) ...........................................................7, 8, 16

81 Fed. Reg. 25,888 (Apr. 29, 2016) ...................................................................... *passim*

84 Fed. Reg. 21,908 (May 15, 2019) ...................................................................9, 30

Alan Wright & Arthur R. Miller, 5 Fed. Prac. & Proc. Civ. § 1202 (3d ed. 2019) ......................23

API Standard 53, *Well Control Equipment Systems for Drilling Wells* 23 (5th ed., Dec. 2018)................................................................................................................23

Exec. Order No. 13783, 82 Fed. Reg. 16,903 (Mar. 31, 2017)........................................8

Exec. Order No. 13795, 82 Fed. Reg. 20,815 (May 3, 2017).........................................8

Federal Rule of Civil Procedure Rule 8 ................................................................ *passim*

Federal Rule of Civil Procedure Rule 12 .............................................................. *passim*

Sec'y of Interior, Secretarial Order No. 3350 (May 1, 2017)........................................8

## INTRODUCTION

The Court should deny Defendants' Motion to Dismiss. Plaintiff Healthy Gulf has plausibly alleged a discrete infirmity in the government's administration of safety regulations for offshore drilling, and has therefore met the pleading requirements of Federal Rule of Civil Procedure 8. Defendants foremost argument for dismissal—that Healthy Gulf lacks total knowledge of Defendants' Administrative Procedure Act ("APA") violations—has been squarely considered and rejected by several courts in this circuit. This matter should therefore proceed to discovery.

This case concerns federal regulations designed to prevent a second *Deepwater Horizon* disaster, particularly standards for the maintenance and testing of "blowout preventers." Those devices thwart and contain the uncontrolled eruption of oil from undersea wells. When they fail—as one did in *Deepwater*—the consequences can be catastrophic, risking incalculable damage to human life, coastal economies, and the environment. Nonetheless, the federal agencies responsible for ensuring the maintenance of blowout preventers have recently waived requirements for the devices at a breakneck pace. The statistics for Defendants' administration of waivers are in fact so anomalous that they indicate the existence of an unannounced policy meant to undo the *Deepwater*-era regulations, a conclusion buttressed by agency communications in which Defendants candidly proposed just such a policy. Because that policy is unannounced and unexplained, it violates the APA.

Defendants ask the Court to dismiss Plaintiff's APA claims on the grounds that Healthy Gulf has not described *all* components of the government's policy towards offshore safety waivers. But a plaintiff cannot describe every last mechanism of a policy whose ends are plain, but whose means remain closely held by the government. That is why courts in this Circuit have repeatedly recognized that plaintiffs may challenge unannounced or unexplained agency policies

1

under the APA so long as the policy's existence is *plausible*. *See, e.g.*, *Hisp. Aff. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018).

There is no reason to deviate from that precedent here. Compared to other cases in which courts have recognized well-pleaded claims against unannounced or unexplained agency action, the statistical and circumstantial evidence for Defendants' waiver policy is robust. That evidence not only renders Plaintiff's claim "plausible" under Federal Rule 8, but also readily answers Defendants' complaint that they lack notice of Healthy Gulf's interest in the waiver policy. In light of that notice—which includes specific allegations of noncompliance with particular subsections of the Code of Federal Regulations—it is striking that the government does not deny it has issued a waiver policy via the Bureau of Safety and Environmental Enforcement ("BSEE"), a subdivision of the Department of the Interior responsible for offshore safety. Indeed, the government does not directly substantiate any alternate explanation for its remarkable deviation from the post-*Deepwater* safety regime.

Even if Defendants had made such a showing, Defendants' Motion to Dismiss should be denied. Federal Rule 8 establishes that competing factual accounts in pleadings should be resolved via discovery and merits briefing, not at the Rule 12 stage. And *Hispanic Affairs Project* and related cases are proof positive that ambiguities regarding an agency's unannounced rule are best resolved through judicially managed compilation and review of the administrative record, not through dismissal. The Court should therefore deny Defendants' Motion to Dismiss and resolve Plaintiff's safety and environmental claims on their merits.

//

//

# BACKGROUND

## I.   Legal Background

The Outer Continental Shelf Lands Act ("OCSLA") regulates offshore drilling. It reflects Congress's judgment that such drilling "should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts . . . which may cause damage to the environment or to property, or endanger life or health." 43 U.S.C. § 1332(6). Thus, OCSLA authorizes the Secretary to issue regulations pertaining to several specific components of offshore oil and gas development, 43 U.S.C. § 1334(a)(1)-(8), and contains a general proviso that "[t]he Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein." 43 U.S.C. § 1334(a).

Pursuant to the Secretary's delegated authority, BSEE has promulgated the regulations contemplated by OCSLA at 30 C.F.R. Part 250. Those regulations require lessees of federal minerals (and their designees) to obtain a "Permit to Drill" before they "begin drilling any well or before [they] sidetrack, bypass, or deepen a well." 30 C.F.R. § 250.410. Permit applications must include detailed information concerning a well's blowout preventer, *id.* §§ 250.410(a), 250.411(f), including "[a] complete description of the [blowout preventer] system and system components," such as "[p]roposed [blowout preventer] test pressures." *Id.* § 250.731(a)(2).

The regulations allow lessees and operators to obtain two types of waivers from BSEE's safety requirements. The first of these is known as "alternate compliance." Specifically, lessees and operators may use "alternate procedures or equipment during operations," *id.* § 250.701, if the alternate procedure or equipment provides a level of safety and environmental protection that

3

equals or surpasses current BSEE requirements, *id.* § 250.141(a). To obtain an alternate compliance waiver, the applicant "must receive the [BSEE] District Manager's or Regional Supervisor's written approval," *id.* § 250.141(b), and "must either submit information or give an oral presentation to the appropriate Regional Supervisor . . . describ[ing] the site-specific application(s), performance characteristics, and safety features of the proposed procedure or equipment," *id.* § 250.141(c).

The second type of waiver allows lessees and operators to apply for wholesale "departures" from the regulations' requirements. *Id.* § 250.702. The process for obtaining approval for such a waiver is less stringent than obtaining permission for alternate compliance: an applicant need only "apply for a departure by writing to the District Manager or Regional Supervisor." *Id.* § 250.142.

## II.    Factual Background

### A.    The *Deepwater Horizon* Disaster

Offshore drilling is inherently risky. Some of this risk stems from the enormous pressure overlying rock exerts on deep reservoirs of oil and gas. Compl. ¶ 45, ECF No. 1. To access these reservoirs safely, offshore drillers must calibrate the internal pressure of a deep sea against the pressures in the mineral deposits. *Id*. If the well's pressure is too high, well fluids will flood out of the well and contaminate the minerals. *Id.* If the well pressure is too low, the minerals will rush into the well and up to the surface, erupting uncontrollably in a "blowout." *Id.* To prevent the latter of these accidents, offshore wells rely on "blowout preventers," which prevent runaway wells by severing the runaway well or plugging the erupting oil. *Id.* ¶ 46.

In April 2010, the offshore drilling rig *Deepwater Horizon* was finishing work on an exploratory well in the Macondo prospect, 42 miles off the Coast of Louisiana. *Id.* ¶ 47. The well—which reached 5,000 feet to the ocean floor and a further 13,000 feet beneath the earth's

surface—failed from faulty design and operation, causing a "kick," *i.e.*, an unplanned rush of hydrocarbons into the well. *Id.* When the blowout preventer failed to arrest this kick, oil erupted from the well, ignited, and exploded, sinking the *Deepwater Horizon* and killing eleven people. *Id.* ¶ 48.

By the time the well was capped in July 2010, the blowout had discharged 4.9 million *barrels* of oil into the Gulf of Mexico, contaminating over 43,000 square miles of ocean and over 1,300 miles of shoreline. *Id.* The post-*Deepwater Horizon* cleanup effort was incredibly costly, enlisting 50,000 workers and prompting the release of one million gallons of dispersants to dilute the spill. *Id.* ¶ 49. The oil and drilling fluids released by the explosion, which contained enormous quantities of carcinogens and methane, ravaged wildlife. Fish displayed lesions and sores or were born without eyes, more than one million birds perished, and dolphins and sea turtles stranded themselves at alarming rates. *Id.* ¶ 50.

The blowout's effects on humans are not yet fully understood, but studies of cleanup workers and nearby residents have found abnormally high rates of rashes, bleeding from the ears and nose, headaches, coughing and other respiratory illnesses, as well as anxiety, depression, and post-traumatic stress disorder. *Id.* ¶ 51. What *is* well understood is the blowout's effect on the Gulf of Mexico's tourism and fishing industries, which were decimated. One study has estimated that the blowout cost the Gulf's fishing industry $8.7 billion and 22,000 jobs by 2020, and a second estimated that the Gulf region would lose up to $22.7 billion dollars in tourism alone. *Id.* ¶ 52.

Since 2010, several reports have reviewed the *Deepwater Horizon* catastrophe and offered recommendations to prevent future blowouts. One report observed that it was necessary to divide the Department of the Interior subagency charged with regulating components of

offshore drilling—the Minerals Management Service—into multiple agencies. *Id.* ¶ 54. As that report noted, the Service's role as both environmental regulator and royalty collector had often tempted the agency to sacrifice one function to the other. *Id.* Consistent with that reasoning, the Department divided the Minerals Management Service into the Office of Natural Resources Revenue, which collects revenue from mineral leases, the Bureau of Ocean Energy Management, which oversees large scale planning of offshore drilling, and BSEE, which enforces environmental and safety regulations at particular drilling sites. *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011).

Many of the post-*Deepwater* reports also offered specific recommendations for blowout preventer design, testing, and operation. For example, the National Commission on the Deepwater Horizon noted that the rig's blowout preventer had only a single, inaccurate pressure gauge, and that the preventer had no way of indicating whether it had activated. *Id.* ¶ 57. The Commission therefore noted the importance of pressure tests of blowout preventer systems, which ensure that the blowout preventers are fully functional. *Id.* The Commission also cautioned that "protocols for testing of blowout preventers must be put in place and enforced." *Id.* The National Academy of Engineering likewise recommended dozens of improvements to blowout preventer monitoring, automation, and reliability, concluding that both Defendants and the drilling industry had previously failed to respond to the preventers' well-documented shortcomings. *Id.* ¶ 58.

Among the many specific technical flaws these reports identified was the failure of *Deepwater Horizon's* "blind shear ram," a failsafe device used in blowout preventer systems to sever a runaway well's pipe. *Id.* ¶ 59. The National Commission concluded that *Deepwater's* blind shear ram possibly failed from poor maintenance. *Id.*

The reports also noted the possibility that the *Deepwater Horizon* disaster resulted from a failure of the blowout preventer's "choke" and "kill" valves, which, during an emergency, funnel drilling mud down into the well at pressures high enough to plug the erupting oil. *Id.* ¶ 60. According to some sources, there was a twenty percent likelihood that failure of these valves was responsible for the failure of the rig's "emergency disconnect system," which, in turn, would have activated the rig's blind sheer ram. *Id.*

Finally, the reports noted that *Deepwater Horizon* may have been prevented by adequate "annular" valves, which are donut-shaped valves lining the interior of a well's casing. The annular preventers are designed to inflate and "pinch" a well shut, but may not have properly functioned in the pressures present during the *Deepwater Horizon* blowout. *Id.* ¶ 61.

### B.      The 2016 Well Control Rule

In 2015, BSEE initiated a rulemaking to cure many of these shortcomings. 80 Fed. Reg. 21,504 (Apr. 17, 2015). As BSEE recognized, "[o]ne consistent element in each of the [*Deepwater Horizon*] investigations was the recognition that additional requirements related to [blowout preventers] and well-control equipment are needed" to avoid another *Deepwater Horizon*-type catastrophe. *Id.* at 21,508. For example, the investigations consistently recommended that BSEE "establish testing . . . requirements for [blowout preventers] to ensure operability and increased reliability appropriate to the environment and application." *Id.*

The proposed rule focused on five categories of requirements related to blowout preventers: shearing requirements, equipment reliability and performance, third-party verification of preventer systems, disclosure of preventer failures or near failures, and blowout preventer testing. The agency received public comments over a ninety-day comment period. One year later, BSEE finalized the Well Control Rule, which added or modified 66 provisions to OCSLA's implementing regulations. 81 Fed. Reg. 25,888 (Apr. 29, 2016). Among these changes

7

were detailed requirements for subsea blowout preventers, 30 C.F.R. § 250.734, preventer components susceptible to high pressures and temperature, *id.* § 250.736, preventer testing, *id.* § 250.737, contingency operations, *id.* § 250.738, and preventer maintenance and inspection, *id.* § 250.739.

With respect to blowout preventer testing, the Rule "add[ed] high-pressure test requirements for [blind shear ram]-type [preventers], outside of all choke and kill side-outlet valves (and annular gas-bleed valves for subsea [preventers]), and inside of all choke and kill side-outlet valves below the uppermost ram." 80 Fed. Reg. at 21,524-25 (describing new requirements codified at 30 C.F.R. § 737(b)(2)); *see also id.* at 21,525 (adding "new requirement" at 30 C.F.R. § 737(d)(7) "to pressure test annular type [preventers]"); *id.* (adding "new requirement" at 30 C.F.R. § 737(d)(10) "to function test BSR [preventers] every 14 days"). The Well Control Rule thus added new testing requirements for various types of equipment, including equipment that may have contributed to the *Deepwater Horizon* disaster.

### C.    2019 Amendments to the Well Control Rule

Since President Trump's inauguration, Defendants have vigorously worked to dismantle the safeguards designed to prevent another *Deepwater Horizon* disaster. In March 2017, President Trump ordered federal agencies to review all agency actions "that potentially burden the development . . . of domestically produced energy[.]" Exec. Order No. 13783, 82 Fed. Reg. 16,903 (Mar. 31, 2017). On April 28, 2017, President Trump issued a second order, directing the Secretary of the Interior to revise the 2016 Well Control Rule. Exec. Order No. 13795, 82 Fed. Reg. 20,815 (May 3, 2017). In turn, then-Secretary of the Interior Ryan Zinke directed BSEE to revise that rule to ensure that offshore drilling would be "promoted." Sec'y of Interior, Secretarial Order No. 3350 at 2 (May 1, 2017). That process has been overseen by BSEE Director Scott Angelle, who has close and lucrative ties to the petroleum industry and who, in a

brazen effort to evade the Freedom of Information Act and other public records laws, encouraged executives in the offshore drilling industry to communicate with him orally on his personal cellphone rather than produce written records subject to federal law's preservation and disclosure requirements. Compl. ¶ 71. The result of this deregulatory effort was a 2019 rulemaking that repealed or modified dozens of requirements for blowout preventers. 84 Fed. Reg. 21,908 (May 15, 2019).

D.     **The Waiver Rule**

Defendants were not content to gut portions of the Well Control Rule only through formal rulemaking. Compl. ¶ 73. They also sought to eviscerate the *intact* components of the Rule by implementing a separate and unpublished policy meant to defang some of the Rule's most important requirements, *id.*, including many of the remaining blowout preventer testing requirements.

On September 22, 2017, Director Angelle wrote BSEE Gulf of Mexico Regional Director Lars Herbst to ask whether, in lieu of delaying some of the Well Control Rule's effective dates, BSEE could effectively cripple the Rule by issuing scores of departures. Angelle explained that "[w]hile we have discussed the possibility of promulgating a rule that further delays the implementation of the dates of the yet to be effective dates of several provisions of the [Well Control Rule] while we are revisiting the entire [Rule], please advise the possibility of avoiding that by considering evaluation of departure request of the proposed April 2018 rule." Compl. ¶ 74.

Herbst then wrote to Gulf of Mexico Region Supervisor Michael Saucier for advice. *Id.* ¶ 75. Saucier expressed doubts as to Director Angelle's request, explaining that "[i]f we do that I would use the directors [sic] phrase: 'put it in writing.' The director should put it in writing that

we do that." *Id.* Herbst conveyed these doubts and more to Angelle, writing on September 23, 2017, that:

> I do not believe the waiver direction is correct. This puts all the burden/ exposure on the permitting engineer or whatever level grants the departure. Moving the implementation dates by rule is what is really needed. *The only way to grant departures in this case is a National level policy document that instructs Regions to grant the waiver and conditions for granting the waiver.*

*Id.* ¶ 76 (emphasis added). Herbst concluded by reiterating his belief that, if Director Angelle wished to delay the Well Control Rule, BSEE should issue a rule to that effect. *Id.* ¶ 77. Director Angelle responded with a one-word e-mail: "Thanks."  *Id.* ¶ 78.

Ultimately, Defendants evidently adopted Director Angelle's plan for a waiver policy. In particular, Defendants appear to have issued a glut of waivers for the Well Control Rule's testing requirements. In response to a Freedom of Information Act ("FOIA") request, BSEE confirmed that between August 1, 2016 (shortly after the Rule's effective date of July 28, 2016) and March 22, 2018, DOI granted over *600* exceptions to the Well Control Rule's standards for blowout preventers at 30 C.F.R. §§ 250.730-739. Compl. ¶ 81; Exhibit A (FOIA response). *Accord* 81 Fed. Reg. at 25,928 (acknowledging that BSEE was "developing internal procedures to improve consistency").

In the early days of the Well Control Rule, BSEE had granted these waivers to ensure a smooth and safe transition to the Rule's new requirements. On July 25, 2016, Defendants explained that "if existing equipment is in substantial conformance with new requirements, the granting of a departure for a *limited* period of time to bring the equipment into full compliance should be granted unless there are obvious safety concerns." Compl. ¶ 82. BSEE therefore released "an initial list of provisions within the [new well control] regulations and incorporated standards for which a departure request should be granted[.]" *Id.* The agency reached similar conclusions regarding applications for alternate compliance. *Id.*

The actions at issue here, however, came years after the Well Control Rule's release. Long after BSEE contemplated a "limited" grace period, the agency has continued to grant waivers at a remarkably high clip. Responding to congressional inquiries, BSEE has confirmed that it granted 960 requests for alternate compliance between January 20, 2017 and March 22, 2018—over one exception per day and nearly *ten* for every platform affected by the Well Control Rule. *Id.* ¶ 84.

### E.    Procedural History

Plaintiff Healthy Gulf is a network of organizations and individuals committed to protecting and restoring the natural resources of the Gulf of Mexico. It commenced this action on September 26, 2019, "challeng[ing] an unlawful rule [the "Waiver Rule"] allowing the Department of the Interior to waive crucial safeguards against catastrophic oil spills in the Gulf of Mexico." *See id.* ¶ 1. Healthy Gulf seeks an order from this Court vacating the Waiver Rule and enjoining Defendants from applying the Rule or any of its substantive determinations. *Id.* at 25. Defendants moved to dismiss the Complaint on January 20, 2020. *See* Mot. to Dismiss Compl. & Mem. in Supp. ("MTD"), ECF No. 10.

## STANDARD OF REVIEW

The pleading requirements of Federal Rule of Civil Procedure 8 are "'not meant to impose a great burden upon a plaintiff.'" *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 27 (D.D.C. 2017) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Thus, a motion to dismiss under Rule 12(b)(6) will succeed only where the complaint lacks "sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

11

Consistent with the purpose of Rule 8, the "plausibility standard" is not a demanding one. While it asks "for more than a sheer possibility that a defendant has acted unlawfully," it is not a "probability requirement," *id.*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the necessary] facts is improbable, and that a [favorable judgment] is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). *See also Twombly*, 550 U.S. at 563 n.8 (citation omitted) (a count will survive so long as there is a "reasonably founded hope that the discovery process will reveal relevant evidence to support the claim"). Nor does Rule 8 "require detailed factual allegations," *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016) (citation omitted), or "all of the precise facts on which the claim is based." *Owens v. Republic of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008). Instead, "[d]etermining whether a complaint states a plausible claim . . . [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In evaluating a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted).

//

//

**ARGUMENT**

I.     **Plaintiff Has Stated A Claim for Relief Under the Administrative Procedure Act[1]**

   A.     **Defendants Cannot Evade Review Under the Administrative Procedure Act by Declining to Announce Final Agency Action**

   Plaintiff's claims arise under the Administrative Procedure Act, which allows courts to review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Ordinarily, such actions are subject to judicial review after they are reduced to a discrete agency order and are publicized. *See, e.g.*, *id.* § 553(d) (requiring publication of agency rules "not less than 30 days before [their] effective date"). But this practice obviously does not account for scenarios whereby an agency adopts new policies without notifying the public, thereby occluding the policies' details and foreclosing judicial review of a discrete, readily identifiable agency work product. Accordingly, the D.C. Circuit has recognized that claims under the APA are cognizable if they allege the plausible *existence* of unannounced agency action, even if the exact details of that action are uncertain. *See Hisp. Aff. Project*, 901 F.3d at 387.

   In *Hispanic Affairs Project*, non-citizen shepherds alleged a "pattern and apparent policy" by which the Department of Homeland Security ("DHS") improperly administered so-called "H2-A visas." *Id.* at 385. By statute and regulation, those visas are reserved for temporary or seasonal work absent special waivers. S*ee id.* at 383-84 (describing program). The shepherds,

---

[1] Defendants' Motion to Dismiss argues that Plaintiff's ostensible failure to specify a "final agency action" for review warrants dismissal for want of jurisdiction. *See* MTD at 13, 14, 17. "The APA, however, is not a jurisdiction-conferring statute," and a plaintiff's failure to specify a "final agency action" for review bears only on whether it has stated a claim for relief and invoked the APA's limited cause of action, not whether the Court retains jurisdiction over the matter. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006). Accordingly, Plaintiff analyzes Defendants' "final agency action" arguments under Federal Rule 12(b)(6), not Rule 12(b)(1). *See also Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).

however, alleged that DHS waivers had become so routine that they could only be the product of an unwritten agency policy. Consistent with these allegations, plaintiff cited testimony that both the shepherds "and their employers routinely operate on the expectation that herders will travel to the United States to work for just shy of three years before returning home for a brief period of time, and then returning for another nearly three-year stint." *Id.* at 386. The shepherds did not, however, identify any discrete government statement acknowledging this policy or explaining its details.

Reviewing the district court's dismissal of the shepherds' APA claims, the D.C. Circuit held that plaintiff's inability to precisely describe the DHS policy was no obstacle to judicial review. *Id.* at 387. Because the shepherds had identified the broad strokes of an agency policy— "the routinized approval" of certain waivers—it was not necessary for the shepherds "to list . . . specific [agency actions] in [their] complaint[.]" *Id.* Instead, the D.C. Circuit addressed the possibility of gaps in the plaintiff's pleadings by explaining that "[o]n remand, the district court is free to exercise its discretion to permit further discovery to ascertain the contours of the precise policy at issue." *Id.* at 388 (citation omitted). *See also Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 929, 931 (D.C. Cir. 2008) (reviewing unwritten agency policy even though "the details of . . . [that] policy [were] . . . unclear"). In anticipation of APA merits review, the district court then proceeded to supervise such discovery until the parties settled. *See* Order, *Hisp. Aff. Project v. Perez*, 141 F. Supp. 3d 60 (D.D.C. 2015) (ECF No. 136).

Several district courts have since applied *Hispanic Affairs Project* and *Venetian Casino Resort* to review claims challenging unannounced or unexplained agency action, consistently rejecting the government's motions to dismiss under Federal Rule 12(b)(6). In *Aracely, R. v. Nielsen*, plaintiffs adequately pleaded a challenge to an allegedly unannounced parole policy of

Immigration and Customs Enforcement's ("ICE"), even though they "fail[ed] to identify a regulation, letter, memorandum, or other form of written material that comprise[d] . . . [the] policy." 319 F. Supp. 3d 110, 138 (D.D.C. 2018). In *R.I.L-R v. Johnson*, the court concluded that plaintiffs stated a claim challenging a similar policy. 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (rejecting government's arguments that allegations of policy were "amorphous" and attacked only "a generalized agency decision-making process"). And in *Amadei v. Nielsen*, the court found that plaintiffs appropriately challenged Customs and Border Protection's allegedly unannounced policy of searching airline passengers for identifying documents. 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) ("plaintiff can satisfy the . . . . [APA] without offering evidence of . . . the agency's position"). In each of these cases—as in *Hispanic Affairs Project*—plaintiffs stated a valid claim for relief where they simply cited a pattern of individual adjudications or behavior as evidence of "the existence of an official policy," the precise details of which were unclear. *Id.*

## B.    Plaintiff Has Plausibly Alleged the Existence of An Unannounced Policy

"[A]ccepted as true," *Iqbal*, 556 U.S. at 678, the facts in Healthy Gulf's Complaint plausibly allege the existence of an unannounced agency policy suitable for APA review. Defendants' own statistics demonstrate that BSEE's waivers are issued as a matter of course and at exceedingly high rates, signaling an "unannounced departure in practice from a written regulation . . . that is challengeable" under the APA. *Hisp. Aff. Project*, 901 F.3d at 387. The existence of such a departure is particularly likely given the remarkable technical demands of the Well Control Rule and associated waivers, which would hinder any uncoordinated, *ad hoc* efforts to ease the agency's safety regulations at the scale favored by Defendants. And if there is any doubt that a waiver policy is at least "plausible," *Iqbal*, 556 U.S. at 678, Defendants have candidly contemplated just such a policy and have elsewhere signaled their intent to conduct agency business outside of the public eye.

To begin, the number and pace of Defendants' waivers is plausibly attributable to one or more unannounced agency policies accelerating BSEE's waiver dispensation or providing substantive guidance on waivers. According to BSEE itself, the agency granted over 960 waivers for alternate compliance between January 20, 2017 and March 22, 2018, which amounts to over one exception per day and nearly ten for *every platform* affected by the Well Control Rule. Compl. ¶ 84. For example, information released pursuant to FOIA confirms that BSEE issued the following numbers of waivers related to blowout preventor testing between August 1, 2016 and March 22, 2018:[2]

**Figure 1: Waivers Issued Between August 1, 2016 and March 22, 2018**

| Requirement in 30 C.F.R. Part 250 | Description | Number of Waivers |
|---|---|---|
| § 734(a)(4) | Remote operated vehicle requirements | 14 |
| § 736(d)(5) | Safety valves for string casings | 76 |
| § 737(a)(2) | Timing of blowout preventer testing | 12 |
| § 737(a)(3) | Exceptions for testing based on casing materials | 22 |
| § 737(b)(2) | High-pressure test for blind shear ram-type preventers | 167 |
| § 737(b)(3) | High-pressure test for annular-type procedures | 64 |
| § 737(c) | Duration of pressure test | 51 |
| § 737(d)(6) | Test for bore-type ram preventers | 55 |
| § 737(d)(7) | Tests for annular preventers against pipe sizes | 10 |
| § 737(d)(9) | Function tests for pipe/variable bore rams | 29 |
| § 737(d)(10) | Function tests for shear rams | 29 |
| § 737(d)(11) | Actuation for safety valves | 54 |
| § 738(n) | Procedures for certain bore rams | 10 |
| § 739(c) | Visual inspections for surface preventer systems | 32 |
| | | **Total:** 625 |

---

[2] The parties agree that because these "figures are integral to the Complaint, [they] have been incorporated by reference into the Complaint." MTD at 27 n.1 (citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).

*See* Ex. A at 3-4.

The agency thus appears to have engaged in precisely "the routinized approval" of waivers that was sufficient for the D.C. Circuit to plausibly infer the existence of an unannounced policy in *Hispanic Affairs Project*, 901 F.3d at 387. Indeed, the quantum of numerical evidence regarding waivers is similar to figures cited by other courts in decisions allowing challenges to unannounced agency policies. *See Aracely*, 319 F. Supp. 3d at 123-24 (recognizing claim against DHS' allegedly restrictive parole policy where plaintiff submitted data "indicating that the parole release rate of . . . asylum seekers who crossed a U.S. Port of Entry was 80 percent in 2012, but dropped to 47 percent in 2015"); *R.I.L-R*, 80 F. Supp. 3d at 174 (same, where plaintiff submitted statistics showing that "ICE released [only] 32 of the 2,602 [asylum seekers] booked into a family residential center" over a sixth month period).

Although the sheer pace and number of waivers would require denial of Defendants' Motion in any event, this case presents a particularly strong "common sense" inference of an unannounced policy, *Iqbal*, 556 U.S. at 679, due to the highly technical and exceedingly specific nature of the underlying regulatory requirements. For instance, the current pressure testing requirements of 30 C.F.R. § 250.737(b)—a section for which BSEE issued at least 231[3] waivers in an 18-month period—command that:

> All low-pressure tests must be between 250 and 350 psi. Any initial pressure above 350 psi must be bled back to a pressure between 250 and 350 psi before starting the test. If the initial pressure exceeds 500 psi, you must bleed back to zero and reinitiate the test. [4]
>
> (i) The high-pressure test must equal the RWP of the equipment or be 500 psi greater than your calculated MASP, as defined for the operation for the applicable section of

---

[3] Figure One, above, omits 28 waivers that BSEE attributed to 30 C.F.R. § 250.737(b) without further specifying what component of that subsection it waived. *See* Ex. A at 4.

[4] As used in this regulation, to "bleed back" means to slowly release pressure from well components, "MASP" is the "maximum anticipated surface pressure for drilling equipment," 81 Fed. Reg. at 25,908, and "RWP" is the "rated working pressure," *id.* at 25,940.

hole. Before you may test BOP equipment to the MASP plus 500 psi, the District Manager must have approved those test pressures in your permit.

(ii) The blind shear ram (BSR) must be tested to:
    (A) MASP plus 500 psi for the hole section to which it is exposed; or
    (B) Full well MASP plus 500 psi on initial latch up and all subsequent [blind sheer ram] pressure tests can be done to the casing/liner test pressure for the applicable hole section.

(iii) The choke and kill side outlet valves must be tested to, except as provided in paragraph (d)(13) of this section:
    (A) MASP plus 500 psi for the hole section to which it is exposed; or
    (B) Full well MASP plus 500 psi on initial latch up and all subsequent pressure tests can be done to the casing/liner test pressure for the applicable hole section. The high pressure test must equal 70 percent of the RWP of the equipment or be 500 psi greater than your calculated MASP, as defined for the operation for the applicable section of hole. Before you may test BOP equipment to the MASP plus 500 psi, the District Manager must have approved those test pressures in your APD or APM.

The remainder the regulations in Figure One, *supra* at 16, contain similarly complex requirements.

It defies belief that Defendants issued hundreds of waivers for these dense, precise, and interlocking regulatory demands on a completely *ad hoc* basis. Far more plausible is the inference that, when Defendants allowed alternate compliance with the demands of 30 C.F.R. § 250.737(b) and similar regulations, they did so pursuant to policies determining when waivers were ostensibly appropriate for a thicket of demanding, technical standards. *Cf. Hisp. Aff. Project*, 901 F.3d at 386 (recognizing APA claim where "[t]here . . . is no evidence . . . to indicate that a widespread pattern of . . . extraordinary circumstances . . . ha[s] underlain [the agency's] seemingly routine and repeated" grant of waivers for H2-A visas).

Further underscoring the plausibility of Plaintiff's allegations are Defendants' explicit inquiries into the possibility of waiver policies and their concomitant belief that such policies are workable. Internal BSEE emails demonstrate that Defendants seriously considered using

informal policies governing waivers to affect a "*de facto* policy" of amending the Well Control

Rule, *Hisp. Aff. Project*, 901 F.3d at 386, and that they saw such policies as an alternative to the

public scrutiny attendant to notice and comment rulemaking. On September 23, 2017, Director

Angelle specifically raised the possibility of using systematic waivers as an end-run around the

Well Control Rule, and multiple BSEE employees quickly responded by noting that while such a

tactic was possible, it would require a "National level policy document" explaining when and

how waivers should issue. *See* Compl. ¶ 76. Both Director Angelle and BSEE employees

distinguished this approach from normal APA rulemaking, in which BSEE would presumably

distribute a substantive rule for public notice and comment. *See Id.* ¶¶ 74, 76.

Defendants' acknowledgement and consideration of the precise tactics alleged in

Plaintiff's Complaint should eliminate any doubt that the Waiver Rule's existence is at least

plausible and therefore sufficient to state an APA claim under Federal Rule 8. The government's

emails confirm that allegations of an unannounced Waiver Rule are not some figment of

Plaintiff's imagination or a necessity of artful pleading, but instead reflect a species of agency

action explicitly contemplated by Defendants themselves.[5] *See Amadei*, 348 F. Supp. 3d at 164

(recognizing well-pleaded claim on basis of scattered agency allusions to unannounced policy);

81 Fed. Reg. at 25,928 (documenting BSEE's intent to "develop[] internal procedures to improve

consistency" for waivers). The use of such a secret policy is also consistent with Director

---

[5] The point of these allegations is that Defendants were plainly familiar with the idea of a change
in waiver policy as a means to circumvent the Well Control Rule, not that the precise
conversation referenced in Plaintiff's Complaint was the genesis of the Waiver Rule. Defendants
are therefore wrong to characterize the email traffic as irrelevant on the grounds that it
occasionally referred to a policy of "departures" instead of "alternate compliance" and did not
immediately lead to a waiver policy for regulations not at issue here. *See* MTD at 22.
Defendants' decision to abandon plans for a "national level policy document" on one occasion
leaves it entirely plausible that they executed such a plan in different circumstances and for
different components of the Well Control Rule.

Angelle's well-documented commitment to communicating with the offshore industry in a manner that thwarts public exposure and accountability—a practice that Defendants do not bother to acknowledge. Compl. ¶ 71. It is also consistent with industry observers' conclusion that offshore operators grew to realize the existence of BSEE's unannounced waiver policies after those policies' implementation. *Id.* ¶ 89.

It does not matter that the material thus far released by Defendants—like the data in *Hispanic Affairs Project* and related cases—may not constitute the strongest conceivable evidence of the Waiver Rule's existence or mechanisms. The Federal Rules "do not . . . require a plaintiff to allege the *most* plausible set of facts, but merely *a* plausible set of facts," and Defendants' own data and statements constitutes such a set. *Zaidan v. Trump*, 317 F. Supp. 3d 8, 20 (D.D.C. 2018). By documenting both (1) BSEE's desire to unwind the Well Control Rule through a waiver policy and (2) evidence showing that BSEE granted waivers liberally and at a remarkable pace, Plaintiff's Complaint supports a plausible inference that Defendants' brisk trade in waivers is an unannounced agency policy subject to discovery and APA merits review. *See Paulin v. George Wash. Univ. Sch. Of Med. & Health Scis.*, 878 F. Supp. 2d 241, 245 (D.D.C. 2012) ("[A] claim . . . may be supported by showing *any* set of facts consistent with the allegations in the complaint.") (emphasis added).

## II.     Nothing Prohibits the Court from Reviewing the Waiver Rule

### A.     Defendants Do Not Show That the Waiver Rule Is Implausible

Defendants offer several loosely drawn variations on the theme that Plaintiff's allegations do not meet the liberal pleading standard of Rule 8. As set forth below, these arguments are meritless and do not account for Defendants' remarkable approach to blowout preventer testing. Even if they did, Plaintiff's claims would survive Defendants' Motion to Dismiss because the allegations in Plaintiff's Complaint are facially plausible: "[i]t is inevitable that [in adjudicating

plausible claims] the defendant's version [of events] will sometimes prove to be the true one, but that does not relieve defendants of their obligation to respond to a complaint that states a plausible claim for relief, and to participate in discovery." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). *See also Browning v. Clinton*, 292 F.3d 235, 243 (D.C. Cir. 2002) ("discovery and summary judgment motions, not Rule 12(b)(6) dismissals, are the appropriate vehicles for weeding out unmeritorious claims"). None of Defendants' arguments renders Plaintiff's allegations implausible and worthy of dismissal.

*First*, Defendants contend that Plaintiff's claims are not well-pleaded because they do not identify a particular agency order or document that is the subject of this lawsuit. MTD at 11, 16. But the cases cited by Defendants for this proposition address pleadings far different than those before the Court. In *Jefferson v. Harris*, the court dismissed plaintiff's APA claim where he "offer[ed] no more specificity" than a one-sentence, conclusory allegation that agencies had issued *wholly* unidentified regulations absent notice and comment. 170 F. Supp. 3d 194, 219 (D.D.C. 2016). The court in *Villegas v. United States* dismissed a similarly terse "claim," noting that the plaintiff did not even "specifically identify which . . . Federal Defendants violated the APA, when they did so, or how." 926 F. Supp. 2d 1185, 1206 (E.D. Wash. 2013). Plaintiff, by contrast, has identified all of the information missing from these cases and more. *See, e.g.*, Compl. ¶¶ 21-24 (identifying Defendants); *id.* ¶¶ 68-109 (elaborating on claims for relief).[6]

---

[6] Less relevant still is *People for the Ethical Treatment of Animals, Inc.* ("*PETA*") *v. Department of Agriculture*, 7 F. Supp. 3d 1 (D.D.C. 2013). In that case—which predated nearly all Circuit precedent elucidating the pleading standard in challenges to unannounced agency policies—the court addressed an agency's alleged policy of forgoing civil *enforcement* of animal welfare statutes. *Id.* at 5-6. Plaintiff's claim rested on an exception to the generally substantial bar against review of agency enforcement decisions, by which affirmative enforcement policies are reviewable because they present a simplified administrative record. *Id.* at 11-12. The court explained that plaintiff's novel claim—challenging an alleged a policy of *non*-enforcement—did not qualify for that exception because such a policy would leave, "by definition[,] almost nothing

In any event, Defendants' argument misses the point: Plaintiff is unable to identify the precise documents demanded by Defendants because, Plaintiff alleges, Defendants have never publicized those documents in the first instance. In such circumstances, plaintiffs meet the pleading standard of Rule 8 so long as they identify plausible, indirect evidence of an agency's unannounced policy. *See supra* at 13-15. "A contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing." *Aracely*, 319 F. Supp. 3d at 139. *Cf. Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 189 (D.D.C. 2017) ("Even after . . . *Iqbal*, a plaintiff may still plead facts upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible") (citation omitted). As set forth above, Plaintiffs have met the pleading standard governing their particular claims for relief and therefore need not pinpoint the locus of Defendants' alleged policies.

*Second*, Defendants fault Plaintiff for not specifying the exact substance of their waiver policy. MTD at 16-17. That argument, too, is foreclosed by *Aracely* and similar cases, which merely require a plaintiff like Healthy Gulf to *outline* the alleged policy. *See supra* at 13-15. Plaintiffs' Complaint easily clears this hurdle. It alleges that Defendants are "shrugging off [their] regulatory limitations," *Hisp. Aff. Project*, 901 F.3d at 387, and ignoring the straightforward requirement that they approve waivers at "a level of safety and environmental protection that equals or surpasses current BSEE requirements." 30 C.F.R. § 250.141(a). *See also* Compl. ¶¶ 91-96. If that were not enough specificity, Plaintiff has also highlighted a discrete

---

for the Court to review." *Id.* at 13. In this case, by contrast, Plaintiff does not test the demanding standards for challenges to civil enforcement decisions and *does* allege the existence of a "broadly applicable . . . policy" that *PETA* recognizes as reviewable on a complete record. *Id.* (citation omitted).

number of particular testing requirements alleged to be at the heart of Defendants' new waiver policy *and* the rates of waivers for each requirement. *See supra* at 16. That is more than sufficient to place Defendants on notice: the government knows exactly what to look for and where to look when answering Plaintiffs' allegations. *See* Alan Wright & Arthur R. Miller, 5 Fed. Prac. & Proc. Civ. § 1202 (3d ed. 2019) ("Rule 8 demands no more" than allegations "sufficient to advise the other party of the event being sued upon, to provide some guidance . . . for purposes of *res judicata* and *collateral estoppel*, and to indicate whether the case should be tried to the court or to a jury").

Despite their complaints of "prejudice," Defendants do not attempt to poke many holes in Plaintiff's description of the waiver policy. They argue chiefly that nothing like the policy can plausibly exist because Plaintiff has inaccurately characterized the requirements of 30 C.F.R. § 250.737—which is only one of many regulations at issue here—as touching upon high pressure testing. MTD at 12. Even if Defendants' efforts at flyspecking were relevant to the *general* contours of an unannounced rule or the aforementioned evidence of that rule, BSEE has misapprehended its own regulations: 30 C.F.R. § 250.737 incorporates so-called "high pressure, high temperature" testing through its incorporation of American Petroleum Standard 53.[7] *See generally* 30 C.F.R. § 250.198 (describing documents incorporated by reference to BSEE's regulations). Nor does *Cost Saver Management, LLC v. Napolitano* rescue Defendants. No. CV 10-2105-JST (CWX), 2011 WL 13119439, at *7 (C.D. Cal. June 7, 2011). The allegations of an unannounced rule in that case—which hinged on only a "single occurrence" of an unannounced

---

[7] *Compare* 30 C.F.R. § 250.737(d)(1) ("You must . . . follow the testing requirements of API Standard 53") *with* API Standard 53, *Well Control Equipment Systems for Drilling Wells* 23 (5th ed., Dec. 2018) (equipment should be "verified for use in HPHT (high-pressure, high-temperature) conditions") (attached as Exhibit B).

inspection policy—are a far cry from the detailed statistics and related conduct Plaintiff has alleged here. Compl. ¶¶ 81-86.

Insofar as Defendants contend in reply that Plaintiff has offered quantitatively less evidence of an unannounced policy relative to similar cases, they are wrong. In cases where plaintiffs have arguably offered more evidence than here, the marginal evidence was relevant to motions for preliminary or final relief that were adjudicated alongside the court's review of the pleadings for "final agency action." Conversely, the courts in these cases relied on much *less* evidence than Plaintiff has supplied when rejecting the government's motions to dismiss. *Compare, e.g.*, *Aracely*, 319 F. Supp. 3d at 139 (denying Rule 12(b)(6) challenge because "Plaintiffs allege that the deterrence policy has been in effect for years") *with id.* at 145-149 (citing much larger body of evidence to conclude that plaintiff was likely to *prove* the existence of the policy, as required for a preliminary injunction); *see also Hisp. Aff. Project*, 901 F.3d at 386-87 (recognizing "extensive evidence" of policy submitted in conjunction with motions for emergency relief and summary judgment, but resolving defendants' "final agency action" argument with reference to only three paragraphs in plaintiff's complaint).

*Third*, Defendants wrongly contend that the rule in *Aracely* and similar cases does not apply here because *Aracely* addressed "an immigration deterrence policy that was essentially conceded." MTD at 17 (citation omitted). That is an inaccurate characterization of *Aracely*, where defendants categorically "den[ied] that any such policy exist[ed]" and submitted a declaration to that effect. 319 F. Supp. 3d at 145, 147-48.[8] And while Defendants do not concede the existence of a waiver policy in this case, nor do they categorically *disavow* one. *See Venetian*

---

[8] Likewise, the government did not concede the existence of an unannounced policy in *Hispanic Affairs Society*, 901 F.3d at 387, *Venetian Casino Resort*, 530 F.3d at 930, or *Amadei*, 348 F. Supp. 3d at 165.

*Casino Resort*, 530 F.3d at 930 (recognizing claim where the government "never denied [plaintiff's] description of the agency's policy").

*Fourth*, Defendants contend that there are "obvious alternate explanation[s]" for the Waiver Rule. MTD at 19 (citing *Twombly*, 550 U.S. at 567). But this case is nothing like *Twombly*. There, the Supreme Court cited antitrust treatises and prior Court precedent to identify a "natural explanation" of defendants' conduct, namely that defendants' industry-specific histories and unique business outlook would independently convince them to refrain from competition. *Twombly*, 550 U.S. at 568-69. Such showings are absent from this case, where Defendants' "obvious alternative explanation" is a *hypothetical* practice—presented without any direct evidence of its existence—whereby BSEE built something resembling the Waiver Rule from the ground up, through case-by-case adjudications. [9]

Instead, Defendants' foremost evidence for their "obvious alternative explanation" is their observation that (at least by some metrics) the pace of waiver approvals has slightly decreased in recent years. *See* MTD at 21. But, as Plaintiff has alleged, there is a ready explanation for this phenomenon: the previous administration planned to grant a higher than normal number of waivers over an initial, limited grace period. Compl. ¶ 82. Far from answering Plaintiff's allegations, therefore, Defendants' figures underscore that BSEE's waivers remain suspiciously commonplace well into the Well Control Rule's lifespan. *Cf. Aracely*, 319 F. Supp. 3d at 148 ("Defendants fail to explain . . . why, despite the policy's alleged discontinuation, parole numbers continue to plummet."). Regardless, Plaintiff's claim is no less plausible if the

---

[9] If Defendants' argument is that they validly crafted a waiver policy through one or more adjudications, they are not on sound footing. *See Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 341 (D.C. Cir. 2019) ("the APA does not contemplate the use of adjudication to develop rules"). BSEE's ambiguity on this score is further reason to apply *Hispanic Affairs Society* and permit inquiry into "the contours of the precise policy at issue." 901 F.3d at 388 (citation omitted).

alleged waiver policy ultimately has some (partial) precedent in a prior administration. *Cf. id.* at 149 ("the mere fact that ICE officials may have been disregarding . . . [agency guidance] before Plaintiffs can pinpoint evidence of a deterrence policy . . . does not undercut Plaintiffs' argument that such a policy existed").

Even if it were more persuasive, the "obvious alternative explanation" for Defendants' waivers—that the waivers flowed *entirely* from independent agency adjudications—would not provide grounds to dismiss Plaintiff's claims. That it because Defendants' "explanation," however plausible, cannot render Plaintiff's allegations so *im*plausible as to warrant dismissal: a "complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible alternative explanations." *Banneker Ventures*, 798 F.3d at 1129 (citation omitted). In this case, nobody disputes that Defendants *could* have chosen to adjudicate waivers on a wholly case-by-case basis instead of by a general policy. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). What Plaintiff plausibly alleges is that Defendants *did not* make this choice, electing instead to develop and rely on unannounced policies to process vast amounts of regulatory exemptions. The answer to which of these plausible accounts is accurate—Plaintiff's allegations or Defendants' vague, unsupported hypotheticals—depends on review of the full administrative records in this matter and is a question for summary judgment, not a Rule 12 motion. *See, e.g.*, *Neustar, Inc. v. FCC*, 857 F.3d 886, 894–96 (D.C. Cir. 2017) (outlining factors for distinguishing rulemaking from adjudication during record review); *Safari Club Int'l v. Zinke*, 878 F.3d 316, 331-33 (D.C. Cir. 2017) (same). Required as it is to draw all reasonable inferences in Plaintiff's favor, "includ[ing] . . . inferences that support the existence of an official policy[,]" the Court should

decline to credit Defendants' alternative explanation as grounds to dismiss this action. *Amadei*, 348 F. Supp. 3d at 165.

*Fifth*, Defendants contend that Plaintiff has not plausibly challenged a "rule," as that term is defined by the APA. *See* 5 U.S.C. § 551(4). According to Defendants, recent amendments to the Well Control Rule rob the Waiver Rule of the "future effect" required of a "rule," *id.*, such that Plaintiff has *actually* and incorrectly pleaded a challenged to an "adjudication" or collections thereof. *See id.* at § 551(7) (defining agency adjudications as a type of "order"); *id.* § 551(6) (defining "order" as "a final disposition . . . other than rule making").

That a Waiver Rule may *no longer* exist has no bearing on whether Defendants' policy was or was not a "rule" *when it was promulgated and effective*. That inquiry turns on the specifics of a policy's design and operation, not whether it was later superseded by a different action. *See, e.g.*, *Safari Club Int'l*, 878 F.3d at 333 (D.C. Cir. 2017) (applying standard). Here, Plaintiff has adequately directed its challenge at a waiver "rule," alleging that the relevant agency action prospectively governed BSEE's waivers from the time of the rule's issuance. *See supra* at 15-20. Those allegations should be the end of Defendants' formalistic argument, a point they elsewhere appear to concede. *See* MTD at 15 n.5. Insofar as Defendants contend that their 2019 amendments leave the Waiver Rule without any prospective effect *after Plaintiff filed its complaint*, that baseless argument goes to mootness—not plausibility under Rule 8—and is discussed in Part II.C of Plaintiff's memorandum, *infra*.

### B.   Plaintiff's Claims Are Not A Programmatic Challenge

Apart from attacking the plausibility of Plaintiff's allegations, Defendants argue that those allegations constitute a prohibited programmatic challenge. MTD at 13-14 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 881 (1990)). In *Lujan*, plaintiff challenged the Secretary of the Interior's implementation of a broad, amorphous command "to determine whether, and for how

long, the continuation of . . . existing withdrawal of [public] lands [from development] would be, in his judgment, consistent with the statutory objectives of the programs for which the lands were dedicated and of the other relevant programs." 497 U.S. at 877 (quoting 43 U.S.C. § 1714(l)(2)). Plaintiff's suit brought "a programmatic 'challenge to *all aspects* of' a land withdrawal scheme, seeking to prescribe how the Secretary could and could not exercise his broad and non-specific grant of statutory authority. *Hisp. Aff. Project*, 901 F.3d at 388 (quoting *Lujan*, 497 U.S. at 890 n.2) (emphasis added). The Supreme Court held that the APA permits no such prescriptions: by challenging what was inherently a diffuse "program" instead of discrete "agency actions," 5 U.S.C. § 704, plaintiff could not simultaneously seek relief for such disparate violations as alleged "failure[s] to revise land use plans in proper fashion, failure[s] to submit certain recommendations to Congress, failure[s] to consider multiple use, [and an] inordinate focus upon mineral exploitation[.]" *Lujan*, 497 U.S. at 891.

Defendants characterize Plaintiff's claims as an impermissible "challenge to an adjudicatory program" in the vein of *Lujan*, MTD at 14, but the D.C. Circuit squarely considered and rejected this argument in *Hispanic Affairs Project*. 901 F.3d at 387-88. There, the government sought to reframe Plaintiff's challenge to a discrete visa *policy* as a wide-ranging attack on an ill-defined, all-encompassing visa *program. Id.* To the contrary, "[t]he Supreme Court stressed in [*Lujan*] that, in contrast to the broad programmatic takeover advanced there, an agency's action in 'applying some particular measure across the board could of course still be challenged under the APA.'" *Hisp. Aff. Project*, 901 F.3d at 388 (quoting *Lujan*, 497 U.S. at 890 n.2). Because the Hispanic Affairs Project challenged a "particular" practice of granting waivers—and because the government "claim[ed] no broad discretionary cloak for its actions"— plaintiff's claims fell outside *Lujan's* bar on programmatic challenges. *Id.*

So too here. Plaintiff has challenged a particular approach to blowout preventer waivers, not a collection of far-flung legal violations from disparate corners of OCSLA and its implementing regulation. Nor can Defendants credibly claim that they issue waivers according to the type of unbounded discretion enjoyed by the Secretary of the Interior in *Lujan*: as in *Hispanic Affairs Project*, the regulations governing Defendants' waivers are "cabined and direct." *Id. See also* 30 C.F.R. § 250.141(a) (allowing waivers only for equipment with "a level of safety and environmental protection that equals or surpasses current BSEE requirements"). As in *Hispanic Affairs Project*, therefore, *Lujan* and its progeny are "of no help" to Defendants. *Id.* at 387. That progeny includes *Bark v. United States Forest Service*, 37 F. Supp. 3d 41, 50-51 (D.D.C. 2014), cited by Defendants but issued four years prior to *Hispanic Affairs Project*.

The only remaining case cited by Defendants for their "programmatic" argument is *Capital Legal Foundation v. Commodity Credit Corporation*, 711 F.2d 253, 259–60 (D.C. Cir. 1983), which preceded *Lujan* by seven years and *Hispanic Affairs Project* by a quarter century. That case did not consider the issue here, i.e., the Rule 8 sufficiency of allegations that an agency is "applying some particular measure across the board." *Hisp. Aff. Project*, 901 F.3d at 388 (citation omitted). *Capital Legal Foundation* instead addressed Article III standing, concluding that a plaintiff cannot manufacture a legally protected *interest* in agency action merely by labeling that action a "*de facto* rulemaking" and thereby invoking the APA's rights to participate in notice and comment. 711 F.2d at 260. Citing the APA's legislative history, the D.C. Circuit concluded that "Congress, in adopting the APA, had no such universal *standing* design in mind." *Id.* at 260 (emphasis added). The court did not opine on when a plaintiff *with* standing plausibly alleges that a pattern of adjudication falls under the APA's *cause of action*.  Like *Lujan*, therefore, nothing in *Capital Legal Foundation* warrants dismissal.

### C.   Plaintiff's Claims Are Not Moot

Finally, Defendants contend that their 2019 amendments to the Well Control have automatically superseded the Waiver Rule, rendering it moot. *Id.* at 12, 24. But Plaintiff filed its Complaint *after* the 2019 amendments and has alleged that those amendments operate independently of the Waiver Rule, *See* Compl. ¶¶ 85, 91-95, such that they do not automatically "rescind[] and replace[] [the] challenged regulation[s]." *Akiachak Native Cmty. v. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016).

Equally significant, the 2019 amendments have almost no bearing on the particular requirements that are the subject of the Waiver Rule: Plaintiff's Complaint alleges that the Rule operates on a discrete handful of requirements regarding blowout preventer testing, and that those requirements remain largely untouched by the 2019 amendments. *Compare* 81 Fed. Reg. at 26,029-26,035 (relevant 2016 amendments to 30 C.F.R. Part 250) (attached as Exhibit C) *with* 84 Fed. Reg. at 21,980- 21,983 (2109 amendments) (attached as Exhibit D). In particular, Sections 737(a)(2), 737(a)(3), 737(d)(6), 737(d)(7), 737(d)(9), 737(d)(11), 738(n) and 739(c) of 30 C.F.R. Part 250 were not amended *at all*, while Sections 737(b)(2), 737(b)(3) and 737(c) include only *de minimis* rollbacks to the Well Control Rule. In these circumstances, Defendants' amendments are legally incapable of mooting Plaintiff's alleged policy: there remains (at least) a "chance that relief will be effective in securing what [plaintiff] seeks," i.e., a declaration that Defendants' intact components of the waiver policy are unlawful. *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019). *See also id.* at 783 (noting that, on motion under Rule 12(b)(1), the court "must assume [plaintiff's theories of relief] are valid unless they are wholly insubstantial and frivolous").

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

February 3, 2020                                Respectfully submitted,

                                                */s/ Travis Annatoyn*_____
                                                Travis Annatoyn (D.C. Bar No. 462679)
                                                Kristen Miller (D.C. Bar No. 220627)
                                                Democracy Forward Foundation
                                                1333 H St. NW
                                                Washington, DC 20005
                                                (202) 639-6500
                                                tannatoyn@democracyforward.org
                                                kmiller@democracyforward.org


                                                *Counsel for Plaintiff*